# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF ILLINOIS
# Urbana Division

| | |
|---|---|
| **EAST LYNN FERTILIZERS, INC.,** | ) |
| Plaintiff/Counter-Defendant, | ) |
| v. | ) |
| **CHS, INC.,** | ) |
| Defendant/Counter-Plaintiff, | ) |
| ------------------------------------------------------- | ) Case No. 09-2085 |
| **EAST LYNN FERTILIZERS, INC.,** | ) |
| Third-Party Plaintiff, | ) |
| v. | ) |
| **LARRY HOSTETTER,** | ) |
| Third-Party Defendant. | ) |

# ORDER

In November 2009, Plaintiff East Lynn Fertilizers, Inc. filed a Second Amended Complaint (#30) against Defendant CHS, Inc., seeking return of a down payment made on an allegedly unenforceable contract. Defendant has filed a cross-claim seeking damages for breach of contract and reimbursement for attorney's fees. Federal jurisdiction is based on diversity pursuant to 28 U.S.C. § 1332. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge.

In August 2010, Defendant filed CHS' Motion for Summary Judgment (#55), and Plaintiff filed Plaintiff East Lynn Fertilizer, Inc.'s Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 and Local Rule 7.1 (#56). Defendant filed CHS' Response to East Lynn's Motion for Summary Judgment and Motion to Strike Improper Statements of Facts (#59), and Plaintiff filed East Lynn's Reply to CHS's Response to East Lynn's Motion for Summary Judgment (#65). Plaintiff filed Response of East Lynn Fertilizer, Inc. to Motion for Summary Judgment of CHS, Inc. (#62). Both parties also filed reply briefs. (#65, #66). After reviewing the parties' pleadings, memoranda, and evidence, this Court **GRANTS** CHS' Motion for

Summary Judgment **(#55)** and **DENIES** Plaintiff East Lynn Fertilizer, Inc.'s Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 and Local Rule 7.1 **(#56)**.

## I. Background
### A. Factual Background

The following discussion summarizes the facts from the evidence presented by the parties. Plaintiff East Lynn Fertilizer, Inc. (hereinafter "East Lynn") is an Illinois corporation that is engaged in the sale of fertilizer and other agricultural products to local commercial farmers. Mr. Keith Allen has owned and operated the business for the past 30 years. Defendant CHS, Inc. (hereinafter "CHS") is a Minnesota corporation engaged in the bulk sale of farm fertilizers to distributors such as East Lynn. Prior to the present controversy, the parties had an ongoing business relationship for a number of years.

In late July 2008, Mr. Larry Hostetter, an agent for CHS, and Mr. Allen orally negotiated a deal in which East Lynn would purchase 360 tons of anhydrous ammonia for $1,180 per ton for delivery in April 2009. (Pl. Dep., #64, p. 19.) Mr. Hostetter sent Mr. Allen an e-mail confirming these terms and stating "Invoice and contract to follow." (#57-1, p. 17.) A few days later, CHS sent East Lynn a four page document entitled "Crop Nutrient Sales Agreement" (hereinafter "the Sale Agreement"). (#56, p. 2, ¶ 3.) Mr. Allen directed his son to sign "Keith Allen" on the document and mail it back to CHS. (#56, p. 3, ¶ 6.) Mr. Allen also directed his son to make a ten-percent down payment in the amount of $42,800 to CHS. (#56, p. 3, ¶ 7.) Mr. Allen's son followed these directions. Mr. Allen stated in his deposition that his intent at the time was to secure inventories for his customers in the event of a shortage of product the following spring. (Pl. Dep. #64, p. 19.) In directing his son to sign the agreement and make a down payment, Mr. Allen intended to purchase the product. (Pl. Dep. #64, p. 47.)

> The signature page of the Sale Agreement states:
>
> Buyer and Seller hereby agree to the terms of this Sale Agreement and the CHS standard Terms and Conditions (Crop Nutrients), which are hereby incorporated into this Sale Agreement. This Sale Agreement will be accepted by Buyer upon

> the earlier of signature below, acceptance of product, or payment of any amounts owed hereunder. Buyer must notify CHS before any of the above events if it does not agree with a term set forth herein.

(#26-1, p. 1.) As previously indicated, Mr. Allen's son signed this page "Keith Allen." Though there is a signature line on the page for CHS, CHS did not sign the Sale Agreement here and the line is blank. After East Lynn returned the Sale Agreement to CHS, CHS filed it and did not sign it. (#56-2, p. 4.)

By November 2008, the market price for anhydrous ammonia had dropped significantly compared to the price established in the Sale Agreement. Mr. Allen e-mailed Mr. Hostetter seeking modification of the agreement. Mr. Allen wrote:

> If this ammonia price falls out of bed for spring. What can we do to void the side dress contract? I need the ammonia but not if I cannot be competitive! I don't expect complete forgiveness of this contract but if NH3 goes to $700.00P/ton by spring, side dress is normally cheaper. I cannot stand a $400.00 plus p/ton loss on a high maintenance produce like NH3. I wanted to ask now while the product is still High instead of waiting 'Until If or When' it does drop! I have never not honored a contract and I don't plan on not honoring this one. However I'm thinking of the future business survival of East Lynn Fertilizer. It doesn't take many tons at $400.00p/ton loss to destroy a little company like ours!

(#57-1, p. 18.)

In December 2008, Mr. Allen e-mailed Mr. Hostetter regarding the Sale Agreement. Mr. Allen explained that he had lost some customers, and his remaining customers' needs had changed. Mr. Allen wrote "I am letting CHS know up front I will not need the ammonia because of reasons that I mentioned." (#57-1, p. 22.) In a letter dated December 31, 2008, Mr. Allen's attorney wrote to CHS expressing the position that the July 2008 Sale Agreement was never a valid and enforceable contract. The letter indicated that once Mr. Allen learned that CHS had never signed the Sale Agreement on the designated signature line and spoke with his attorney, Mr. Allen no longer felt that the Sale Agreement was binding. (#57-1, p. 31-33.)

## II. Legal Standard

The Court will grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material factual dispute exists that requires a trial. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The party seeking summary judgment bears the initial burden of showing that no such issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he must go beyond the pleadings and support his contentions with proper documentary evidence. *Celotex*, 477 U.S. at 322-23. Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmoving party must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e)(2); *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). To successfully oppose a motion for summary judgment, the nonmoving party must do more than raise a "metaphysical doubt" as to the material facts, and instead must present definite, competent evidence to rebut the motion. *Wolf v. Nw. Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001); *Albiero*, 246 F.3d at 932.

## III. Analysis
### A. Overview of Claims

Plaintiff argues that there is no enforceable contract, and thus it has filed suit to seek return of the $42,800 down payment. Defendant has filed a counterclaim seeking enforcement of the Sale Agreement and payment of attorney's fees and collection costs.

Plaintiff argues that the threshold issue of whether a valid contract exists is governed by Illinois law. Plaintiff asserts that, either under Illinois law or under the language of the contract specifying methods of acceptance, there is no enforceable contract because Defendant did not sign the contract on a designated signature line. Defendant argues that there is an enforceable contract, and it also argues that Plaintiff owes Defendant attorney's fees and collection costs under the terms of a pre-existing credit agreement between the parties.

### B. Choice of Law

The Sale Agreement at issue contains a choice of law provision providing that the agreement is governed by Minnesota law. Initially, in Plaintiff's motion for summary judgment, it concedes that Minnesota law governs interpretation of the contract: Plaintiff argues that the contract specified what actions would constitute acceptance, and that none of these actions occurred. However, in its response to Defendant's motion for summary judgment Plaintiff argues that the contract is not valid because it is not signed by Defendant, and that Illinois law should govern the threshold question of the contract's validity.

In a diversity case, the federal court must apply the choice of law rules of the forum state to determine applicable substantive law. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941). Illinois respects a contractual choice of law clause as long as the contract is valid and the law chosen is not contrary to Illinois's fundamental public policy. *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 705 (7th Cir. 2004). In the absence of a governing choice of law clause, Illinois will apply the "most significant contacts" test, set forth in the Restatement (Second) of Conflicts § 188 (1971), in deciding choice of law disputes with respect to contractual issues. *Hinc v. Lime-O-Sol Co.*, 382 F.3d 716, 719 (7th Cir. 2004). Under this "most significant contacts" test, a court will consider factors including the place of contracting, negotiation, performance, location of the subject matter of the contract, and the domicile, residence, place of incorporation, and business of the parties. *Id*. Furthermore, where parties have not identified a conflict in state law, a court will generally apply the law of the forum state. *Kochert v. Adagen Med. Int'l., Inc.*, 491 F.3d 674, 677 (7th Cir. 2007).

Where parties dispute the existence or validity of a contract, the Court is not bound by any choice of law clause contained in the contract in determining the threshold question of the contract's validity. *Thomas v. Guardsmark, Inc.*, 381 F.3d 701, 705 (7th Cir. 2004). Here, the contract at issue was negotiated in Illinois, and the product would have been delivered in Illinois. None of the factors of the "most significant contacts" test favor applying the laws of Minnesota, other than the fact that Defendant is a Minnesota corporation. Therefore, under the "most significant contacts" test, it is appropriate for this Court to apply Illinois law to the threshold question of validity of the contract. If the contract is valid, then Minnesota law governs all contract interpretation issues due to the choice of law clause in the Sale Agreement. The Court further notes, however, that there is no material difference between Illinois and Minnesota law that would affect the outcome of this case.

### C. Contract Formation

Plaintiff argues that the parties did not form a valid, enforceable contract due to the fact that Defendant did not sign the contract. Plaintiff argues that, given the absence of Defendant's signature, Defendant never accepted the contract. Plaintiff asserts that the common and statutory laws governing contracts, as well as the provisions of the Sale Agreement that specify methods of acceptance, both support its position.

First, Plaintiff asserts that under the common and statutory laws governing contracts, there is no enforceable contract because Defendant did not sign the Sale Agreement. Under the Uniform Commercial Code, as adopted in Illinois, a contract for the sale of goods over $500 must be signed by the party to be charged to be enforceable against him. 810 ILCS 5/2-201. A party signs a contract by "using any symbol executed or adopted with present intention to adopt or accept a writing." 810 ILCS 5/1-201(b)(37). This provision is designed to handle merchants' practice of stamping documents or of using printed signatures. *Feldman v. Allegheny Intern., Inc.*, 850 F.2d 1217, 1222 (7th Cir. 1988).

6

Here, the parties engaged in oral negotiations, followed by e-mails confirming an agreed upon quantity and price, and Defendant told Plaintiff "contract to follow." (#57-1, p. 17.) Defendant then provided Plaintiff with a copy of the Sale Agreement, which was a form contract with a CHS, Inc. logo. (#26-1.) Plaintiff signed the Sale Agreement and returned to Defendant. Defendant kept and filed the Sale Agreement, but did not sign it on a line at the bottom of the form that designated a place for signature. (#56-2, p. 4.) Filing contracts without Defendant's handwritten signature was Defendant's common practice at the time. (#56-2, p. 4.) Contrary to what Plaintiff seeks to argue to a jury, none of these facts support an inference that Defendant did not have a present intention to be bound by the Sale Agreement when Defendant presented it to Plaintiff. Furthermore, Plaintiff's subsequent e-mails to Defendant seeking "forgiveness" from the contract, as well as Plaintiff's deposition testimony, demonstrate that Plaintiff had a present intention of adopting the Sale Agreement when he signed it. Finally, Defendant's signature is not required to enforce the contract against Plaintiff because Defendant is not the party to be charged. Under these circumstances, this Court finds that a jury could not reasonably conclude that the contract is unenforceable due to the lack of Defendant's signature at the bottom of the form.

Second, Plaintiff asserts that the Sale Agreement specifies methods of acceptance, that none of these methods of acceptance was undertaken, and thus that there is not valid enforceable contract. The Sale Agreement states: "This Sale Agreement will be accepted by Buyer upon the earlier of signature below, acceptance of product or payment of any amounts owed hereunder." (#26-1, p. 1.) Plaintiff argues that this provision is ambiguous with respect to whether Defendant's signature below is required, and with respect to what constitutes payment of "any" amount owed under the contract. A contract is ambiguous only if its language is reasonably susceptible to more than one interpretation. *Art Goebel, Inc. v. N. Suburban Agencies, Inc.*, 567 N.W.2d 511, 515 (Minn. 1997). The determination of whether a contract is ambiguous is a question of law. *Id*.

7

Here, the language of the Sale Agreement clearly provides that Buyer accepts the contract by signing or by paying any amount owed under the contract. There is no language to support Plaintiff's arguments that Defendant's signature is required or that making a down payment does not constitute "any amount" owed under the contract. Plaintiff signed the Sale Agreement and paid a $42,800 down payment. Thus, the contract is not ambiguous, and under the terms of the contract, Plaintiff accepted the contract by signing it, and also by making the down payment, which was an amount owed under the agreement. This Court finds that a jury could not reasonably conclude that Plaintiff did not accept Defendant's offer and enter a contract, given the language in the Sale Agreement specifying methods of acceptance.

In summary, whether applying the statutory and common law rules of contracts or applying the terms of the contract itself, Plaintiff accepted the Sale Agreement, and the Sale Agreement is a valid and enforceable contract. Plaintiff breached the Sale Agreement by failing to pay the contract price. Thereafter, Defendant was entitled to keep the $42,800 down payment and bring suit for damages.

### D. Attorney's Fees

On April 2, 2002, six years prior to the events giving rise to this lawsuit, Plaintiff signed Agriliance, LLC Credit Application and Corresponding Credit Agreement (hereinafter "Credit Agreement") with Agriliance, LLC. The Credit Agreement states:

> Customer agrees to pay the entire debt that customer shall incur on any Agriliance, LLC account which may be granted to customer, plus all collection costs and attorney fees, plus any finance charge which may be imposed in accordance with the terms of Agriliance, LLC credit agreement which is set forth below and is made a part hereof.

(#13-1, p. 13).

Defendant alleges that CHS purchased Agriliance, LLC as a whole in 2007, and that therefore it may enforce the Credit Agreement against Plaintiff. Defendant provides an affidavit, a press release, and SEC filings confirming that Agriliance distributed its entire wholesale crop nutrients business to CHS. (#66-1). Plaintiff responds that the Credit Agreement represents a

prior agreement barred by the parol evidence rule, or alternatively that enforcement of the Credit Agreement is barred by an integration clause in the Sale Agreement.

First, Plaintiff asserts that evidence of the Credit Agreement is barred by the parol evidence rule. The parol evidence rule is a substantive rule of contract interpretation, which prohibits the admission of extrinsic evidence of prior or contemporaneous oral agreements, or prior written agreements, to explain the meaning of a contract when the parties have reduced their agreement to an unambiguous integrated writing. *Danielson v. Danielson*, 721 N.W.2d 335, 338 (Minn. Ct. App. 2006). Parol evidence is ordinarily inadmissible to vary, contradict, or alter the written agreement. *Id*. Here, Defendant seeks to enforce the Credit Agreement as a separate contract. Defendant does not offer the Credit Agreement as evidence pertaining to interpretation of the Sale Agreement. Therefore, the parol evidence rule is inapplicable.

Second, Plaintiff asserts that the Credit Agreement is barred by an integration clause in the Sale Agreement. The Sale Agreement states: "Total Agreement. Collectively the terms and conditions on this side and term and condition on the face of this document incorporate the entire understanding of both parties." (#26-1, p. 3.) This Court notes that such an integration clause incorporates the entire understanding of both parties with respect to the terms and conditions of the Sale Agreement. However, the Credit Agreement does not alter or affect in any way the terms and conditions of the Sale Agreement, but rather pertains to Plaintiff's rights and obligations regarding extension of credit. This analysis is not altered by the fact that the Sale Agreement invoice contains a term stating that payments not received are subject to a 18% annual finance charge (#26-1, p. 4). This finance charge is consistent with the finance charge contemplated in the Credit Agreement. (#13-1, p. 13). A mere reference to it on the Sale Agreement invoice does not indicate that the terms of the Credit Agreement affect the terms of the Sale Agreement. The Court concludes that the integration clause in the Sale Agreement does not bar enforcement of the Credit Agreement.

In summary, the Credit Agreement is enforceable, and the plain language of the Credit Agreement provides that Plaintiff agreed to pay all collection costs and attorney's fees resulting from any lack of payment for debts incurred to Agriliance, LLC in exchange for a line of credit. Because Defendant purchased Agriliance, LLC, Defendant has the right to enforce the Credit Agreement against Plaintiff. The Court concludes that Plaintiff is liable to Defendant for all collection costs and attorney's fees.

### E. Damages

Defendant asks the Court to reserve its ruling on damages and attorney's fees and costs for a later determination. The Court will reserve a ruling on these matters pending further proceedings.

### IV. Summary

For the reasons stated above, the Court **GRANTS** CHS' Motion for Summary Judgment **(#55)** and **DENIES** Plaintiff East Lynn Fertilizer, Inc.'s Motion for Summary Judgment Pursuant to Fed. R. Civ. P. 56 and Local Rule 7.1 **(#56)**.

ENTER this 3rd day of December, 2010.

s/ DAVID G. BERNTHAL
U.S. MAGISTRATE JUDGE