UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
Urbana Division

| | |
|---|---|
| **EAST LYNN FERTILIZERS, INC.,** ) | |
| ) | |
| Plaintiff/Counter-Defendant, ) | |
| v. ) | |
| ) | |
| **CHS, INC.,** ) | |
| Defendant/Counter-Plaintiff, ) | |
| ------------------------------------------------------- ) | Case No. 09-2085 |
| **EAST LYNN FERTILIZERS, INC.,** ) | |
| ) | |
| Third-Party Plaintiff, ) | |
| v. ) | |
| ) | |
| **LARRY HOSTETTER,** ) | |
| ) | |
| Third-Party Defendant. ) | |

# ORDER

In November 2009, Plaintiff East Lynn Fertilizers, Inc. filed a Second Amended Complaint (#30) against Defendant CHS, Inc., seeking return of a down payment made on an allegedly unenforceable contract. Defendant filed a cross-claim seeking damages for breach of contract and reimbursement for attorney's fees. Federal jurisdiction is based on diversity pursuant to 28 U.S.C. § 1332. The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge. This Court previously granted CHS' Motion for Summary Judgment (#55) with respect to liability (#74).

In May 2011, Defendant filed CHS' Motion for Summary Judgment Regarding Damages (#81), and in June 2011 Plaintiff filed East Lynn Fertilizer, Inc.'s Response to CHS' Motion for Summary Judgment Regarding Damages and Motion to Strike Improper Statement of Facts (#84). Defendant filed CHS' Reply to East Lynn's Response to CHS' Motion for Summary Judgment Regarding Damages (#85). After reviewing the parties' pleadings, memoranda, and

evidence, this Court **GRANTS** CHS' Motion for Summary Judgment Regarding Damages **(#81)** pursuant to FED. R. CIV. P. 56 and Local Rule 7.1.

### I. Factual Background

Plaintiff East Lynn Fertilizer, Inc. (hereinafter "East Lynn") is an Illinois corporation that is engaged in the sale of fertilizer and other agricultural products to local commercial farmers. Mr. Keith Allen has owned and operated the business for the past 30 years. Defendant CHS, Inc. (hereinafter "CHS") is a Minnesota corporation engaged in the bulk sale of farm fertilizers to distributors such as East Lynn. Prior to the present controversy, the parties had an ongoing business relationship for a number of years.

In July 2008, the parties entered in to a contract (hereinafter the "Sale Agreement"), providing that East Lynn would purchase 360 tons of anhydrous ammonia for $1,180 per ton for delivery on April 1, 2009. (#26-1). Under the Sale Agreement, East Lynn had a right to pull the product from April 1, 2009, to May 30, 2009. (#26-1).

In November 2008, the market price for anhydrous ammonia had dropped significantly compared to the price established in the Sale Agreement. Mr. Allen e-mailed Mr. Hostetter, a CHS representative, seeking modification of the agreement. (#84-2). Mr. Hostetter did not agree to any modification of the contract, and he was instructed by his supervisors at CHS not to have any further communication with Mr. Allen on this matter. (#84-1). In December 2008, Mr. Allen indicated to CHS that he may not accept the ammonia, writing: "I am letting CHS know up front I will not need the ammonia . . . . Please let me know at your earliest convenience. If CHS will work with me. If not! I need to Know that too." (#84-3).

East Lynn owed CHS the full balance due under the contract on March 1, 2009. East Lynn did not make any payment. At that time, as of March 2, 2009, CHS considered East Lynn to be in default on the contract. (#82-2, p. 13). Nevertheless, despite East Lynn's default, CHS continued to perform their obligations under the contract. CHS delivered the

ammonia on April 1, 2009, and left it available for East Lynn to pull until May 30, 2009, as contemplated in the parties' agreement. (#81-2, p. 7).

However, as early as March 2009, CHS began looking for other buyers. At this time, the market conditions for anhydrous ammonia were still challenging for sellers, due to the fact that demand had unexpectedly plunged. CHS's expert witness described the market conditions for anhydrous ammonia as follows:

> Q: All right. So around the 2nd of March you tried to start looking for places to get rid of these tons [of anyhydrous ammonia that East Lynn had failed to collect].
> A: Yes, that's correct.
> Q: And I think you testified that there was just no market?
> A: That's exactly right.
> Q: What's your explanation for there not being a market?
> A: Basically, it all goes back to the world economy tanking. As – as the world economy tanked, so did the price of anhydrous ammonia. Prior to that the corn price was very strong; dealers and growers were contracting much earlier than usual to supply their needs for the next spring, for the next crop.
> Then when things started to tank, all of a sudden the demand dried up from what they thought was going to be; and – and as the market is falling, obviously, there's no buyer that's going to step up and buy anything. They're going to wait, hopefully find the bottom at some point. So the market just shut down for several months.
> Q: Okay. So would it be fair to say that in March of '09 people had already purchased enough anhydrous for spring use the preceding fall, farmers?
> A: Yes. Actually, it turned out that they overbought.
> . . .
> The dealer overbought, anticipating what he thought the farmers were going to use.
> Q: Okay.
> A: Then the farmers, after the price got so high, they started backing off on how much they were going to use. So the demand backed off. So then all of a sudden dealers were sitting with more prepaid tons than they need.
> Q: Okay. So the dealers had a bunch of tons that they were trying to unload, and at the same time you're trying to unload tons?
> A: Yes.

(#81-2, pp. 13-14).

3

A relevant industry publication called the Green Markets Report tracks market prices for anhydrous ammonia on a weekly basis. CHS's witness testified that the Green Markets Report is the best unbiased source for the market price for anhydrous ammonia in the East Central Illinois region. (#81-4, p. 4). The publisher of the report determines prices by querying dealers and distributers in the relevant local area. The price is published as a range, reflecting the fact that prices vary due to the logistics of delivery, particularly the distance of the delivery location from the Mississippi River. (#81-2, p. 4). The area in which East Lynn operates is included in what the report refers to as the Eastern Cornbelt. (#81-2, p. 4). In a June 1, 2009 Green Markets Report, the price range for anhydrous ammonia in the Eastern Cornbelt was listed as $340 - $370. (#81-3, p. 9). This report is the closest date available to May 30, 2009. (#81-3).

Beginning March 2009, CHS began to attempt to sell the tons of anhydrous ammonia that it had previously earmarked for East Lynn. In March 2009, CHS sold 20 tons of the product to Waterway Ag. for $490 per ton. (#81-2, p. 4). This sale was within the market range indicated by the Green Markets Report, which was $440 - $525 per ton at that time. (#81-2, p. 4). In August 2009, CHS sold another 40 tons to Waterway Ag. for $295 per ton. (#81-2, p. 4). This sale was below the market range indicated by the Green Markets Report, which was $320 - $345. (#81-2, p. 4). CHS's witness testified that, in this instance, the Green Markets Report was not fully reliable, due to the dropping price and low volume of transactions, and that he felt he could not get a better price. (#81-2, p. 16). CHS did not provide East Lynn advance notice of either sale. (#81-2, p. 8).

After these sales, CHS still had 300 tons of anhydrous ammonia remaining that had been designated for East Lynn. However, due to difficulty finding buyers, CHS used this remaining anhydrous ammonia for internal production. CHS bought phosphoric acid to combine with the anhydrous ammonia to produce liquid phosphate, a product that CHS routinely produced throughout most of the year. (#81-2, p. 7).

## II. Motions to Strike

For clarity, the Court will briefly discuss two pending motions to strike before the Court.

First, East Lynn indicates that their response to CHS's motion for summary judgment also serves as a motion to strike improper statements of fact from CHS's motion. For all of the facts that East Lynn moves to strike, it notes whether it disputes the proposed facts and whether the proposed facts are material. East Lynn does not make any argument for why these proposed facts should be stricken, apart from arguments that may apply to contesting any proposed fact, such as arguments that the facts are immaterial, legal conclusions, or not properly supported by evidence. The Court therefore denies East Lynn's motion to strike improper statements of fact. Where East Lynn has indicated a fact is disputed, the Court will address these disputes where they are relevant.

Second, the Court notes another pending motion to strike, CHS Inc.'s Motion to Strike Late Disclosure (#82). The subject of this motion to strike is East Lynn's disclosure of expert opinion, disclosed to CHS on May 31, 2011, several days after CHS filed this present motion for summary judgment. The expert opinion at issue in this motion to strike is not attached to or referenced in East Lynn's response to CHS's motion for summary judgment. Therefore, because East Lynn has not sought to use the information that CHS seeks to strike, the Court concludes that it need not address CHS Inc.'s Motion to Strike Late Disclosure (#82) prior to addressing the present motion for summary judgment.

## III. Standard

The Court will grant summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material factual dispute exists that requires a trial. *Waldridge v. Am. Hoechst Corp.,*

24 F.3d 918, 920 (7th Cir. 1994). The party seeking summary judgment bears the initial burden of showing that no such issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

The Court must draw all inferences in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986). However, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he must go beyond the pleadings and support his contentions with proper documentary evidence. *Celotex*, 477 U.S. at 322-23. Because the purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmoving party must respond to the motion with evidence setting forth specific facts showing that there is a genuine issue for trial. *See* FED. R. CIV. P. 56(e)(2); *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001). To successfully oppose a motion for summary judgment, the nonmoving party must do more than raise a "metaphysical doubt" as to the material facts, and instead must present definite, competent evidence to rebut the motion. *Wolf v. Nw. Ind. Symphony Soc'y*, 250 F.3d 1136, 1141 (7th Cir. 2001); *Albiero*, 246 F.3d at 932.

### IV.  Discussion

CHS argues that it is entitled to $265,720 or, in the alternative, $254,520 for breach of the sales agreement plus $86,898.63 in attorneys' fees. East Lynn argues that genuine issues of material fact remain regarding the measure of damages to be awarded. The Court will briefly address the parties' choice of law, and then it will consider parties' arguments with respect to the appropriate method of calculating damages. Last, the Court will address award of attorney's fees.

*A.  Choice of Law*

The Sale Agreement at issue contains a choice of law provision providing that the agreement is governed by Minnesota law. This Court noted in its order granting CHS' Motion for Summary Judgment with respect to liability that Minnesota law governs all contract interpretation issues due to the choice of law clause in the Sale Agreement. (#74, p. 6).

Minnesota has adopted the Uniform Commercial Code. Throughout this opinion, the Court references the relevant U.C.C. sections and the corresponding Minnesota statutes.

*B. Damages*

For breach of the Sale Agreement, CHS argues that it is entitled to $265,720 under Section 2-706 of the Uniform Commercial Code. Section 2-706 considers mitigation sales in computation of damages. In the alternative, CHS argues that it is entitled to $254,520 under Section 2-708, which considers the contract price minus the price at the time of tender. CHS also argues that it is entitled to $86,898.63 in attorney's fees. East Lynn argues that genuine issues of material fact remain regarding the measure of damages to be awarded.

As an initial matter, East Lynn argues that genuine issues of material fact remain as to whether CHS's recovery should be limited by a failure to mitigate damages. East Lynn argues that CHS failed to mitigate damages by ignoring East Lynn's e-mails of November 7 and December 12, 2008, requesting modification of the Sale Agreement. The duty to mitigate damages does not include an obligation to renegotiate a contract in the event of an unforseen falling market. *See* MINN. STAT. § 336.2-703; U.C.C. § 2-703.[1] East Lynn's failure to make payment and resulting breach of contract took place on March 1, 2009. (#82-2, p. 13). Any duty to mitigate damages arose at this time. This Court finds as a matter of law that CHS's refusal to consider East Lynn's e-mails did not amount to a failure to mitigate damages.

Section 2-703 of the Uniform Commercial Code grants a seller remedies under Sections 2-706 or 2-708 for a breach of contract.

---

[1] East Lynn does not argue that the December 12 e-mail (in which Mr. Allen stated he did not need the product and asked if CHS would "work with" him) constituted a repudiation of the contract. Even if East Lynn's December 12 e-mail constituted a repudiation of the contract, CHS had a choice of remedies available under U.C.C. § 2-703, none of which would have involved a duty to renegotiate the contract with a buyer in breach.

> Where the buyer wrongfully rejects or revokes acceptance of goods or fails to make a payment due on or before delivery . . . the aggrieved seller may . . .
> (d) resell and recover damages as hereinafter provided (section 336.2-706);
> [or] (e) recover damages for nonacceptance (section 336.2-708).

MINN. STAT. § 336.2-703; *see* U.C.C. § 2-703. Thus, as the statute directs, the Court will consider CHS's available remedies under Sections 2-706 and 2-708.

First, CHS asserts that, under U.C.C. § 2-706, CHS is entitled to $265,720, the difference between the resale price and the contract price of the breached agreement. "When the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price . . . ." MINN. STAT. § 336.2-706(1); U.C.C. § 2-706(1). Section 2-706 requires, "[w]here the resale is at private sale the seller must give the buyer reasonable notification of his intention to resell." MINN. STAT. § 336.2-706(3); U.C.C. § 2-706(3). A failure to provide "reasonable notification" to the buyer of the seller's intent to resell constitutes a failure to comply with § 2-706. *Highway Sales, Inc. v. Blue Bird Corp.*, 559 F.3d 784, 793 (8th Cir. 2009) (applying Minnesota law). "[F]ailure to comply with § 2-706 deprives the seller of the measure of damages here provided and relegates him to that provided in Section 2-708." *Highway Sales, Inc. v. Blue Bird Corp.*, 504 F. Supp. 2d 630, 647 (D. Minn. 2007); *see also* MINN. STAT. § 336.2-706 cmt. 2.

Here, CHS resold portions of the anhydrous ammonia previously earmarked for East Lynn. CHS made two sales to Waterway Ag. and used the remaining product for internal production. (#81-2, p. 4); (#81-2, p.7). CHS did not provide East Lynn with notice of these sales. (#81-2, p. 8). Therefore, CHS is barred from using these sales as a basis for recovery under Section 2-706.[2]

---

[2] Parties dispute whether CHS's internal use of anhydrous ammonia to create a new product may constitute a "sale" for purposes of computing damages. This argument is only relevant to computing damages under Section 2-706. Because the Court is applying Section 2-708 to compute damages, the Court does not reach the question of whether CHS's internal use of the product may constitute a sale.

Second, CHS asserts that under U.C.C. § 2-708, CHS is entitled to $254,520. "The measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price . . . ." MINN. STAT. § 336.2-708(1); U.C.C. § 2-708(1)(a). Thus, the Court will consider the time for tender of the anhydrous ammonia and the market price of anhydrous ammonia on that date.

Regarding the market price at the time and place for tender, CHS calculated damages based on a market price reported in the Green Market Reports. East Lynn disputes the use of these reports. In addressing use of market reports as evidence of market price, the U.C.C. states:

> Whenever the prevailing price or value of any goods regularly bought and sold in any established commodity market is in issue, reports in official publications or trade journals or newspapers or periodicals of general circulation published as the reports of such market shall be admissible in evidence.

MINN. STAT. § 336.2-724; U.C.C. § 2-724.

Here, CHS's witness testified that the Green Markets Report is the best unbiased source for the market price for anhydrous ammonia in the East Central Illinois region. (#81-4, p. 4). The publisher of the report determines prices by querying dealers and distributers in the relevant local area. The price is published as a range, reflecting the fact that prices vary due to the logistics of delivery, particularly the distance of the delivery location from the Mississippi River. (#81-2, p. 4).

East Lynn fails to propose an alternative means for computing the market price at the time and place for tender. East Lynn argues that the Green Markets Report is unreliable because, in August 2009, the market price in the Green Markets Report was more than ten percent higher than the price at which CHS made its second sale to Waterway Ag. However, this sale price discrepancy does not singlehandedly undermine the credibility of the publication. Furthermore, it is noteworthy that East Lynn is arguing against its own interests. In mentioning CHS's August 2009 sale to Waterway Ag., East Lynn is suggesting that the actual market price was lower than the market price published in the Green Markets Report. Using a lower actual market

9

price while calculating damages under Section 2-708 would only increase damages by increasing the difference between the unpaid contract price and the market price at the time and place for tender. The Green Markets Report may be imperfect, but it is nonetheless the best available measure of the market price at the time and place for tender. Due to the lack of evidence of an alternative, this Court concludes that any reasonable jury would rely on the Green Markets Report to establish the prevailing price of anhydrous ammonia.

Regarding the time for tender, the ship dates in the Sale Agreement are from April 1, 2009, through May 30, 2009. CHS argues that the time for tender under Section 2-708 is therefore May 30, 2009, the last day on which East Lynn could pull the product. In the June 1, 2009, Green Markets Report, the price range for anhydrous ammonia in the Eastern Cornbelt was listed as $340 - $370. (#81-3, p. 9). June 1, 2009, was the next available business day after May 30, 2009, and the June 1, 2009, report reflects data gathered from sales prior to May 30, 2009. (#81-3).

The Court acknowledges that the nature of the delivery specified in the Sale Agreement makes it difficult to definitively ascertain a single delivery date for which the market price can be calculated. However, East Lynn fails to offer an alternative estimate for the market price during the period for tender or any additional evidence from which such a market price might be calculated. CHS reasonably calculated damages based on the last day the anhydrous ammonia could have been tendered to East Lynn. *See Jacobs v. Rosemount Dodge-Winnebago South*, 310 N.W.2d 71, 78 (Minn. 1981) (indicating that under the UCC, where a measure of damages is not easily amendable to mathematical precision, a trier of fact may assess damages so long as that assessment is reasonable and not punitive); *see also* RESTATEMENT (SECOND) OF CONTRACTS § 352. According to the Sale Agreement, East Lynn would "accept delivery of all Product purchased pursuant to [the] Agreement prior to the ending ship date specified." (#26-1, p. 3). This indicates the time of tender extended to May 30. CHS therefore reasonably calculated damages at $254,520 using an average value of $355 per ton based on the last possible date of delivery. (#81, pp. 13-14). Because Plaintiff has not presented evidence

supporting an alternative calculation, a reasonable trier of fact must necessarily accept this conclusion. The Court therefore grants damages in the amount of $254,000 to CHS under Section 2-708.

C. *Attorney's Fees*

CHS asserts that it is entitled to $86,898.63 in attorney's fees for breach of the Sale Agreement. The Court has already determined that CHS is entitled to attorney's fees. (#74, pp. 8-10). Now, East Lynn disputes certain expenses, indicating that certain fees would not have been incurred if CHS has properly complied with discovery rules. The Court rejects East Lynn's contention in this respect. The Court has previously noted that CHS did not fail to comply with discovery rules, but rather that East Lynn was not thorough in its discovery efforts. (#73, p. 2). Defendant has presented billing invoices for the requested amount. (#81-5). The Court has carefully reviewed CHS' affidavit, and it finds that the requested attorney's fees are reasonable. The Court grants Defendant $86,898.63 in attorney's fees for this matter.

### V. Summary

For the reasons stated above, the Court **GRANTS** CHS' Motion for Summary Judgment **(#81)** pursuant to FED. R. CIV. P. 56 and Local Rule 7.1. This case is terminated. The Clerk of Court is directed to enter judgment in favor of Counter Claimant CHS, Inc. on its counterclaim against Counter Defendant East Lynn Fertilizers, Inc. in the sum of $254,520. In addition, attorney's fees shall be awarded to CHS in the amount of $86,898.63.

ENTER this 5th day of December, 2011.

s/ DAVID G. BERNTHAL
U.S. MAGISTRATE JUDGE